Good morning, Your Honors. My name is Steve Mackey. I represent North Valley County Water and Sewer District in this matter. Dale Rieger is counsel for St. Marie Condominium Association. And we intend to divide our time for me to have 12 minutes and him to have 8 minutes. I guess I'll just have to monitor that myself. The time is short. Let's just jump into some questions that are bothering me. Okay. The district court dismissed the appeal on mootness grounds. Yes. On the grounds that the reorganization plan had been substantially implemented. What was the current state of implementation of the plan for the district court and what is it today? Okay. The plan of reorganization provided that the assets of EPI would be transferred to the corporation. That was accomplished. Stock had been issued by the corporation. And the corporation at that time had, the new corporation had, obtained lien releases from some of the creditors. I don't believe there were any property sales at that time. You have no BFPs, no third parties that have come in and purchased property or anything like that? I believe that's correct. Not quite now though. Today. Right, and today. I'm going to say that there might be one or two, maybe three people that have bought property, a lot here or there. They've made a number of transactions, but they were to insiders. And then they were actually transferred back because they couldn't go through with it. I feel pretty confident or confident. You don't look very confident. Well, I feel I'm, since I don't want to misrepresent, I'm. So you're not very confident. I mean, are you or are you? Yes, I am confident that the corporation today has basically made no further transfers except two or three. Okay. Let me phrase the question just a little bit differently. Okay. If you were to prevail on this appeal. Yes. We were to send this back to the bankruptcy court. Yes. What relief could the bankruptcy court grant you? The bankruptcy court. What would the bankruptcy court do? The bankruptcy court could reinstate our liens on our 24 pieces of property that we have, that we had liens, that we still have liens on because we haven't released those liens yet. And it would. Would the bankruptcy court have to unravel any transactions that have taken place? No. In the intervening years? No. None of our property has been transferred or affected in any way. But there are other secured creditors who have other liens. Presumably, if this was undone, it wouldn't just be undone for you. It would be undone in general. It could be just undone for us, but I think it should be undone for everyone. If it's undone for everyone, has anything transpired since the district court that would make that more difficult than it was at the time of the district court? I don't believe so. I'd like to say they have, like, 220 pieces of property, and they've maybe sold two or three, and they still have all the others. The company's already back in bankruptcy, as you know. We put it. We asked the court to take judicial notice of that. And so I feel very confident, okay, that under the standard enunciated by Baker and Drake, which is one of this Court's opinions, that the appeal is not moved, okay, because it holds only when, in the absence of the State, events occur that make it impossible for the appellate court to fashion any effective relief. Which company is already back in bankruptcy? Pardon me? What company is already back in bankruptcy? I'm sorry. What company is already back in bankruptcy? St. Marie Development Corporation. And that is the corporation that all the assets were transferred to, and we were issued stock in, okay, in return for our first priority security interest. And I filed a motion for the court to take judicial notice of that, and that should be in the record there someplace. And that plan, they have filed a plan of reorganization that has not yet been confirmed, and they're just the third plan of reorganization, essentially from the original development. Yes, it would be the third plan of reorganization, at least. At least. I've lost track of how many plans of reorganization I have. I'm just concerned about the mootness issue. I didn't mean to interrupt you. No, that's actually the mootness issue is my first presentation, and I'm glad you leapt into it because I think that's one that really has to be addressed. But as far as the new bankruptcy, then relevant to the mootness issue, too, is it because something else has happened, which is that there's another proceeding to re-reorganize all this? No, I don't think so, because they really haven't done anything. The corporation is just they're trying to sell property, and they're not being successful. You know, they've marketed maybe, like I say, two or three pieces of property, and all the others they have and they still have. The whole reason they filed the new bankruptcy was because they couldn't pay their property taxes. I'm wondering, nothing is feasible here. Pardon me? Nothing is feasible here. I mean, the more I read, the more I hear. I mean, it's like a dead duck, the whole thing. It is. Right. It is a dead duck. It's a dead duck for the third time. They are. We aren't. We're trying to just get our liens, you know, go back and get our property. As it is now, we have stock in a dead duck corporation. The alternative is that you have a lien in unmarketable property. Pardon me? The alternative is that you have liens in unmarketable property. Well, we have liens on 24 pieces of property that the county could sell. Okay. And the reason for that is that under Montana tax law, they can sell the property for just the value of the taxes against them. And on 23 of the pieces of property, those taxes per property probably total only several hundred dollars, certainly less than $1,000, and they could market those for that, I think, pretty easily. In fact, the reason the new third bankruptcy was filed was because somebody had come to the county and wanted to obtain those properties under what we call the tax certificate process. And the principal, Mr. Bethea, of this company, I keep wanting to call it a dead duck now, Mr. Bethea said that the only reason they filed the third bankruptcy was to stop somebody from buying the tax certificates from the county on certain pieces of property. So you want your liens back. We want our liens back. What's the face value of those liens? Collectively, probably somewhere between $25,000 and $30,000. How much do you hope to recover if we give you your liens back? $25,000 to $30,000. Do you think that's there? If it isn't, it's awfully close. Because your point is that somebody will buy a condo for $500, essentially. They'll buy it, yeah, I think so. That's essentially what your suggestion is. And we have evidence of that because the new bankruptcy was filed because somebody had come to the county, to Valley County, which is my additional client in the new bankruptcy, and said we want to buy the tax certificates. It's pertinent, very pertinent to the ultimate question of indubitable equivalence. Indubitable equivalence. Because your basic point is that this may not be marketable in the sense that anybody would want to sell a condo for, but for $500 you could sell it. Is that basically your point? It's not equivalent in the sense that it's not market value isn't zero. It might be very, very little, but your lien is very, very little. Yes. Yeah, on each one. Yeah. But collectively it's $26,000 or so. You wouldn't have to sell them collectively. You could sell them individually. We can sell them individually, yes. Yes, we can. What other points would you like to make? You know, I think we've briefed to death the five, what I call, substantive grounds for appeal. I just remind the Court that confirmation, to uphold confirmation of a plan requires all criteria to be satisfied. And if any one of those is not satisfied, then the plan should not have been confirmed. What's the big point that you say is missing? You say it has to satisfy all five. What is the most glaring deficiency? In the Water District's perspective, the most substantial is the indubitable equivalent. Getting stock in a worthless corporation is not the same as having a first-priority lien. From the point of view of the other objections, some of them are ---- That only matters, I think, because your liens are so small. Right? I mean, you're looking to recover so little on each piece of property that the difference between almost zero and zero could matter to you. That is, if the value of the property is, it's said at various times to be almost zero, but almost zero might be good enough for you to recover on your lien. Almost zero is good enough for us because we get all the dollars until we're paid. So even if we have a claim of, say, $500 against a piece of property, if it sells for $400, at least we get all $400 of it. As it is now, we get maybe ten cents. And are your liens the first-priority liens on those properties? Yes, because they are taxes, and under Montana law, that's the first-priority tax. It comes ahead of everything. And I've cited there's authority in my briefs on that point. As far as you asked me about the points, some of them are just, in my opinion, ipso facto, you know, on their face, not satisfied. For example, the special treatment of one of the creditors, Valley Bank, they got to retain their lien and could foreclose on it. Everybody else lost their liens. Bankruptcy code says everybody in the same class has to be treated exactly the same. That's a ---- Isn't that a hard problem? Because it's certainly not true that it was illegal for them to own the stock, but apparently it was illegal for them to hold the stock for more than a year. So if the whole point of this thing was to that over time it would gain value, they weren't going to be able to be around to gain that value. So they were essentially going to get less than everybody else did, if you believe me. And they were going to have to sell out within a year before any value would be seen. So therefore, there was almost no way to make them equal was the problem. Well, I ---- that may be the case. They could have put them in a separate class, okay, and done it that way and given them the same thing. What difference would that have made to you? It wouldn't have mattered at all. Except that that would have disqualified them from then pursuing ---- well, no, if they had done that, that would have been okay. I don't want to make a difference. So it's sort of an understatement. That one, yeah. It's just ---- but it's glaring on its face. And we're putting all 34 creditors in one class. That's just unprecedented. Was the court mistaken as to whether the bank could own the stock? No, I don't think the bank made any error as far as dealing with the bank. Okay. Under Montana law? I'm taking the bank's attorney's word for it that that's under Montana law, I believe. It may be a Federal law. It was an error with regard to whether they could own the stock. They could own it, but they couldn't hold it for more than a year. That's my understanding of the statute. Okay. It was technically an error, but not in any way that really makes a difference. No, not really. That one isn't. But, yeah, we aren't getting what we'd get. You know, all those grounds I briefed, I mean, we wouldn't get what we'd gotten in the Chapter 7 liquidation. They admit that. They admit that in a Chapter 7 liquidation, we'd have just gone ahead and foreclosed our liens, and they took our liens away from us. Anyway, I'm out of time. Thank you, kindly. Next. May it please the Court. I'm Dale Rager, and I represent the St. Marie Condominium Association. The St. Marie Condominium Association is an association of the unit owners in this condominium that purchased their units prior to the filing of the initial bankruptcy of Valley Park. And these people are principally a retired military who had been marketed these condominium units because it was a former Air Force base at Glasgow, Montana. Mr. Mackey, in his briefs, he's focused on the grounds for not approving the plan, that the plan itself didn't satisfy the requirements for approval. Our part of the appeal that we've preserved is problems with a disclosure statement that was approved by the court. And we've identified in our briefs a number of problems. I think, generally speaking, those problems relate to improper value, that a number of the assets that were described in the disclosure statement were valued in excess of millions of dollars. And based on appraisal going back to 1996, and everyone acknowledged In the last case, we have a very deferential standard of review on this. Isn't it an abusive discretion standard? Yes, we believe it is, Your Honor, on that issue. There's an awful lot of latitude on this disclosure. Well, I think this satisfies the requirements for Show us how it abused. Well, there was one glaring error. There was like a huge tax lien that wasn't in there. There was some huge amount of money, like $350,000. That's correct, Your Honor. There was approximately $320,000 in state and local taxes that were not even disclosed in the disclosure statement and admitted to by the debtor or by the plan proponent. Why is that material? Wouldn't the tax debt have been transferred into a senior lien? Well, that particular tax, yes, Your Honor, would have been a lien against the property. But that's something that an investor would want to know about if they were going to vote in favor of the plan. You would soon learn that fact. Well, I think under the rules, the investor is entitled to rely on the information in the disclosure statement. And the disclosure statement is supposed to contain sufficient information for them to make an informed, reasonable decision about whether or not to vote in favor of the plan. And in this particular case, because of the valuation of the assets, the overvaluation of the assets, and the undervaluation of the liabilities, we believe as a matter of law that they ---- The valuation of the assets, leaving aside this $320,000, I mean, the disclosure statement disclosed what it was based on, disclosed the fact that it or didn't have to disclose it. Anybody would know that it was old information, and it's what they had. And why isn't that good enough? Well, in addition to that, Your Honor, there had been significant deterioration in the property since the time of the previous appraisal. And so the previous appraisal really had no validity in determining what the value was. Anybody who was going to invest would know that. They'd know that this was in 1996. They'd go look at the property and say it doesn't look so hot now. So it's not ---- the standard is reasonable, fully practical or something to that effect. And why wasn't this sufficient? Well, Your Honor, I think this whole plan hinges upon value and a determination that there is value here for unsecured creditors. And because the plan depends upon value, I think that's a significant issue that needed to be accurately disclosed by the plan proponent. So your practical underlying point is really that they might not have gotten the votes from the unsecured creditors. I mean, why does this all matter? That's why it would matter. Yes, Your Honor. Our position would be if there had been full disclosure about all the facts, then the voting in favor of the plan would have been different. Is your understanding of the state of affairs with the organization plan the same as your co-counsel? Yes, it is, Your Honor. If we can reserve a few minutes for rebuttal. All right. Thank you, counsel. Thank you, Your Honors. My name is James Patton. I represent the Valley Park Liquidating Trust. As this Court recognizes, this is an extremely difficult reorganization problem that the Liquidating Trust has. It was thrust into the middle of it by the abdication of the plan proponent from the first confirmed plan, the Quantum Group. And the Liquidating Trust expended several years' worth of effort to clarify the property in bulk as it was allowed to do, we think, under the Quantum plan. The question first, which is to go back to the mootness issue, could you give us your version of what's happened since the district court, if anything, that might be pertinent to the mootness issue? Yes, Your Honor. Since the plan was confirmed, a corporation has been created, the stock has been issued, the property has been transferred, lien releases have been filed, the property has been transferred, lien releases have been filed, and That was all true at the time of the district court. Yes. What has happened since then? I believe, Your Honor, that there have been nine condominium units that have been sold since then. There were, as Mr. Mackey indicated, other sales that were seller financed, and they've come back, and so those properties have been returned. And sold to whom? To complete outsiders? I believe they're complete outsiders, yes, Your Honor. You believe? Yes. I mean, are we skating on that thin ice again, though? Well, a little bit, Your Honor, because there have been some sales to a family member of one of the board of directors on the St. Marie Development Corporation, Marv Bethea, Mr. Mackey mentioned his name. His mother bought some units. I think that I don't know whether those units are included in the nine or not. If we were to conclude that this is not moot and send it back and tell the bankruptcy board, unravel it, is that feasible, what would happen? I don't think that it is feasible to unravel it, but for a different reason, Your Honor. We have 350 separate parcels of property that are owned by the St. Marie Development Corporation now. The liens on that property have been released. To unscramble the egg, as this Court has described before, we would have to go back and identify for each of the 350 parcels of property what the liens were as. That's so complicated. You know what they were. Well, it's not complicated, Your Honor, on a parcel-by-parcel basis, but we have voluntary liens, we have involuntary liens, we have liens that are overlapping. Whatever you had before, just put it back. If you release them, put them back on? Well, but here's the practicality of just putting them back on. We have to go in for each parcel and identify what the liens were before, okay? Then we have to go back and recreate the liens, some of which, if they were involuntary liens, may have lapsed by operation of law. We have to recreate those for each parcel, get the cooperation of all of the parties so that they can be stacked back in the same order. It's certainly not impossible. Excuse me, Your Honor? It may be a pain, but it's certainly not impossible. Well, Your Honor, I would say that it's somewhere between a pain and being impossible. It also sounds expensive. I mean, is it going to eat the thing alive? Well, who's going to pay for it? That's the point. Who's going to pay for it? Because the liquidating trust doesn't have any money to pay for it, and if the whole thing's unwound, then the St. Marie Development Corporation doesn't have any money to pay for it. I don't know that the individual lien holders are going to pay for it. We're going to have to go back into bankruptcy court. We're going to have to stack the liens on each parcel as they were before. I think go to the judge and say, Judge, is this adequate? I think we'll tie up the bankruptcy court for days and days and days just getting that. What about the new bankruptcy, if we're going to make things complicated, to make these even more complicated? Well, the new bankruptcy has new creditors that complicates it. It has its own creditors that are separate and distinct from the creditors of the old bankruptcy, and remember, the creditors of the old bankruptcy are the people in control. The secured creditors and unsecured creditors of the old bankruptcy are who own this property. They're the ones who elect the board of directors, and they're in complete control of the property. So the new bankruptcy, we would have to allocate out or marshal out assets to pay the claims of the new bankruptcy, and then what's left, I suppose, can come back. But I think that this court has, in various bankruptcy, mootness decisions, identified sort of three rules. One, and there are two rules, but each rule has the same element. One is that the appellant didn't get a state pending appeal, which is the case we have here. They tried. They tried, but they were unsuccessful. And the fact is, Your Honor, that they didn't get a state pending appeal, and it's been almost exactly two years now since the plan was confirmed. Why were they unsuccessful? They were unsuccessful because I think they couldn't show merits, that they could prevail on merits on appeal. I find the most troublesome part of the merits is the question of indubitable policy. And why, as we were saying before, if the Water District has very small means on individual pieces of property, how is it the equivalent to give them this interesting stock in a now, once again, bankrupt company, rather than to let them sell those condos for almost nothing? Not nothing, but almost nothing, because that's all they needed. They didn't need them. They needed almost nothing. Well, Your Honor, the hearing record before the bankruptcy court was entirely one-sided, because we were the only ones to put on any evidence whatsoever. But the ultimate conclusion was still almost nothing. It wasn't nothing. Well, it was hardly any value. They only needed $500 on a condo. I mean, so they don't need much. But I don't know if hardly any value is the same as $500. And the problem, Your Honor, is that the holding cost of owning this property is negative. You've got to pay money out to own something that you can't sell. That was the evidence before the bankruptcy court. And I think the bankruptcy court fully accepted that evidence. And I think that the situation is, is that they may have got stock in a worthless corporation, but their collateral was also worthless. It had no value. There was nobody to buy it. That was the evidence before the bankruptcy court. They could have put on their own evidence to say that the property is worth whatever number they wanted to put on the testimony for, but they didn't bother. All of the testimony came from the liquidating trust. And that liquidating trust testimony was that you can't sell this property, and owning it is more burdensome than not owning it, because you have to insure it, pay taxes on it, maintain it, do all sorts of things, and you don't have a market for it. We have an old air base that's literally in the middle of nowhere, and there's very little demand for that housing unless, as the planned proponent wanted to do, is to develop an economic development using the adjacent runway and old air base facilities like that. Is it physically run down, as some of the photographs show? Well, I think those are by far the worst, Your Honor. There's some of the units are in perfectly good shape, and some of them are run down. But it's, you know, the disclosure statement described at the insistence of the condominium association, the deterioration that had occurred in the property, the supplement to the disclosure statement that had occurred since, I think, the initial disclosure statement filed by Quantum was filed. They had some photographs that looked real bad, and those depict those particular properties. But there's, like I said, 350 parcels of property here, and I don't think that those are at all typical of what the situation is there. What about the missing $320,000 in the disclosure statement? Those were post-petition property taxes. They should have been included in the disclosure statement, and they weren't. But I think that, Your Honor, you put your finger on the problem, is so what? Had it been in the disclosure statement, would it have been any different? The judge knew that it wasn't in the disclosure statement, because the county had written the court a letter saying these are the post-petition property taxes. And in the exercise of the judge's discretion, he determined that it was not critical that that information be included in the disclosure statement. I would submit that the bankruptcy court fully appreciated the huge problem that everybody faced with this property in terms of trying to somehow turn it into money so that the creditors could get paid. And I think the court, after listening to the testimony put on by the liquidating trust, agreed that the trust plan paid the creditors an equivalent amount to what their claim was worth, and that the creditors did therefore receive the indubitable equivalence of their claim, and that the plan was feasible, and that the other required elements of confirmation were met. And I think the bankruptcy court took all of this into account, realized and understood and appreciated all of the practical problems that this whole project faces in terms of its location. It turned out the plan wasn't feasible. Excuse me? It turned out that the plan was not feasible. Well, I'm not sure that I would quite agree with that, although that would be a good conclusion to draw from the fact that it's in bankruptcy. But what has happened is, as Mr. Mackey related, when the county started to sell or threatened to sell these tax certificates, then that would have then started disjoining the ownership of the property, which is something that the whole purpose of the liquidating trust plan was to contain the ownership of the property, clean the title up, and have a sort of a unified piece of property that could be sold. The tax certificates were not inconsistent with the present plan? Yes. They were or they were not? They were not consistent with the present plan. Not inconsistent. They were inconsistent with the present plan. Why did you have to have another bankruptcy then? Why couldn't you just come back and say you can't do that? Well, because they were postpetition claims, and I don't think we're allowed to impair postpetition claims. How did you get rid of the secured creditors? Excuse me? The different treatment of the secured creditors. The whole thing started, Your Honor, with the quantum plan. In the same secured creditors that we made deals with, the bankruptcy court rejected two of them and accepted the one with Valley Bank. Those were the same three arrangements that those creditors had made with quantum. It was Patrick Kelly, an engineering firm, and the Valley Bank. And in the original quantum plan, they all stipulated, and the stipulations were approved by the bankruptcy court, that the creditors after a certain period of time, if they were unpaid, could simply exercise their lien rights and take their collateral back. Exercise their what rights? Lien rights. And so when we came forward with our modified plan, we agreed with those creditors to preserve those same rights that they had previously negotiated in connection with the quantum plan. The county water district had a first priority lien. Yes. It didn't get any, it didn't get, it was not granted, afforded any special treatment. No, because it hadn't requested and received that special treatment in the original quantum plan. But it still seems blatantly inconsistent with the equal treatment rule, whatever may have been true in the first. Well, I think that in terms of Kelly, the engineering firm, and Valley Bank, you're correct, Your Honor. And I think that's why the bankruptcy courts rejected the treatment of Kelly and the engineering firm. The bank presented a special circumstance based on the state law that you discussed with Mr. Mackey that precludes a bank from holding stock for certain period of time. So we could give the stock to the bank, but we couldn't force the bank to hold that stock while we went through liquidation and sold the property. And, again, I think, Your Honor, you put your finger on it when you said, so what? In hindsight, if we would have created a separate class for that creditor and treated them that way, then the argument couldn't be made, and we'd still have otherwise the exact same situation. And that's true also with respect to the complaint about that various others of the lien holders should have been in separate classes, but because it's a lot, so they would have been in separate classes. Well, with regard to the rest of the lien holders, it's only logical to treat them in the same class because we're all giving them the class A preferred stock. But different classes, you could still give them all class A stocks. Yes. And they could still all vote against it, and as long as there still would have been one class voting for it, so we would have been in the same place. You're exactly correct. But it seemed to me to be logical to put them all in the same class because they're all being treated, except for the bank, they're all being treated the same. They're all getting stock for their claims. It's not an easy situation. The liquidating trust didn't have the benefit of going out and hiring auditors to prepare financial statements or to do a number of the things that the condominium association wanted us to do. We had to play the cards that were dealt to us. We had to use the tools that were at our disposal. We had an old appraisal that we had commissioned in connection with a fraudulent transfer complaint. We tried to put all the cards on the table and say, until we clear up the lien situation and own this property so that we can engage in owner finance sales and so forth, we're simply not going to be able to generate anywhere close to the money that's necessary to pay the claims. I think the liquidating trust proposed the most practical plan that it could come up with in order to get everybody paid. I think that the plan, I think the bankruptcy court agreed that the plan has the, can accomplish that, and it needs to accomplish that. And without, if we go back to the quantum plan, if this court reverses, we go back to the quantum plan. Quantum doesn't exist anymore. The plan proponent is nowhere to be found. Then where are we? Then we either need to do a whole other plan all over again or dismiss the case and just let whatever happens happens or convert to a Chapter 7, in which case I don't think anybody's going to get anything because they're all going to own little bits and pieces that have no economic value and have only liabilities associated with it, liabilities of ownership. I'm sure you don't have a crystal ball, but what do you see emerging from this second or this new bankruptcy? Well, I believe that the St. Marie Development Corporation was progressing toward accomplishing what the plan intended, and a year into it all of a sudden they were faced with the problem of the tax certificate sale. I think that if the St. Marie Development Corporation plan is confirmed and that just allows them to get back on track that it was on before, to – But isn't that, I mean, this is sort of a doomsday scenario, but, so then you have to go back and then there's some more post-petition tax claims and then there's some more post-petition tax certificates. How do you ever catch up with them? Well, they've simply got to sell property in order to avoid – in order to pay the property taxes as they fall due. And as a practical matter, the only way to sell enough property to do that is to entice, either entice an employer to come into the runway and the hangers and whatnot and create some jobs there, or to engage in some kind of owner-financed sale where they can sell a large block of property and use the proceeds to operate on and pay the taxes on and make distributions to redeem some of the stock, so that they're able to sell it without somebody having to come up with millions of dollars up front to step into this – Presumably the reason that there's property taxes is because somebody thinks there's some value that's being taxed. I would have to agree with Your Honor, but I would say that's not in the record before the bankruptcy court and it should have been, if that's the case. But I think that Judge Peterson, the bankruptcy judge's findings are entitled to be maintained unless they're clearly erroneous, and I think in the record they're not clearly erroneous, primarily because they didn't put on any evidence. Several hundred acres of property is worth zero. I mean, that's sort of the indubitable zero problem. Well, does property – if your question is it's hard to believe that it's worth zero? Well, it's not only hard to believe. It seems to me that one wouldn't need a record to say we don't know what it's worth, but it's more than zero. Well, I think the record does say that, and I think Marva Thay's testimony is that it's worth zero because it costs too much to hold it. Property is literally, Your Honor, in the middle of nowhere. It's a long way from anywhere, and there's no reason – little reason for people to live there. No fishing? No skiing? Your Honor, it's pretty flat. The closest mountain is probably 200 or 300 miles away. There might be fishing, but that's probably about the only thing. And it's only in the summer months. It's cold in the winter and it's hot in the summer. Do you have anything else, Counselor? I don't, Your Honor. Thank you very much. I guess we've got two minutes. Don't feel pressed. If you have something really valuable you want to say to us, go ahead. I'd like to respond to one question that was asked, I believe, by Judge Berzon. I may have that wrong. About what will happen with the new bankruptcy. Will it just go, you know, if this matter is sent back? It will just go away. I'm virtually certain of that. It was set for a confirmation hearing this coming Friday, the 6th. And the attorney for – it's not Mr. Patton in that case. He's also a creditor now. The attorney in that case called me and said that he's going to ask that it be postponed pending the outcome of your decision because if your decision is to send it back, then that whole case is just meaningless. And I realize that's not in the record, but the question was asked, so I wanted to respond to it. What would be the state of affairs if you were to prevail in this appeal? Well, I don't think it's that complicated. As happened in the Chu case from this circuit, the court can just order the liens put back in place, and we know what they are because they were all included in there, and we just – You make it sound very easy. The other side makes it sound like a mechanical, complex monstrosity that costs too much money to accomplish. Well, it's not because our liens are reinstated. It's easy to say that, but isn't there a whole process one has to go through? How many are there? It sounds like totally across the board there's a lot. Well, there's 34 secured creditors, although some of those are on the other liens. Oh, I'm not aware of any. There aren't any other liens except my client. There are additional. They were discharged because of the plan, but if they had to put them back again. Yes. Then what? There's a whole bunch of other liens out there they'd have to come back in, don't they? I'm not sure I'm understanding. The liens would all just go back just the way they were. Just like poof, or somebody – Well, yeah, yeah. Nothing magic has to happen. The bankruptcy court's decision is vacated, and the liens are back in place. And there's no recording that has to be done? You don't have to record anything? You don't have to notify anybody? Not for us. There may be a few others that have given releases, and they would have to be notified, and their liens would be ordered back in place. But that wouldn't be very difficult to do. Are you going to pay for it? Well, we're not going to pay for it, because we're going to then foreclose our liens, our first priority tax liens, which we don't have anymore, because that's the whole problem here. They've done an unprecedented thing, I think, in bankruptcy law. That question, and I'd like to answer, even though your time is up. The answer that I received to your basic point, which is that we could foreclose on these liens and get some value, that may be, but you didn't put on evidence of that before the bankruptcy court. What about that? There was evidence. Mr. Bethea said that they had value, had some value. He didn't say they had no value. He used the phrase, and I think this is what Mr. Patton is referring to, is that they're more of a liability than an asset. And obviously what he means is to hold and market them, because there's marketing expense and maintenance expense, I guess, and those sorts of things that would be expense. But we don't have any expense, because we're just going to foreclose them and sell the property. What evidence did you put in of value? We didn't put any on, because Mr. Bethea put the testimony on that it has some value. They sold one or two for $5,000, although they were just sold to his mother. It sounds like a lot of value. But they don't need a lot of value. Well, in Montana, I mean, $5,000. No, it's not a lot of money, but it's enough to pay our tax liens, which are several hundred dollars. One of them is $12,000.  But that's a big complex. That's a building. So I just think that stripping liens is an unprecedented matter in bankruptcy law, and I don't believe there's any support for it, nor has any case been cited. I just think the thing needs to be sent back and let the creditors foreclose their liens. Thank you. Thank you. Do you have anything to add, counsel? I have nothing further to add. Thank you both. Thank you, all three. The case has started. It is ordered and submitted.
judges: Trott, Paez, Berzon